# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DAVID C. ADAMS,**

        **Plaintiff,**

**v.**

                                        **CIVIL ACTION NO. 3:04CV124**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF**
**SOCIAL SECURITY,**

            **Defendant**.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

David C. Adams ("Plaintiff") filed his application for DIB on June 5, 2003, alleging disability as of April 1, 2002, due to depression, post-traumatic stress disorder ("PTSD"), arthritis in both knees, degenerative arthritis of the lumbar spine, gout, and tinea pedis[1] (R. 64). His Date Last Insured ("DLI") is December 31, 2002[2] (R. 15). The application was denied initially and on reconsideration (R. 34, 35). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ")

---

[1] Popularly called ringworm of the foot or athlete's foot. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 1914 (30th ed. 2003).

[2] Plaintiff must therefore prove he was disabled on or before December 31, 2002, to be entitled to DIB benefits. See 42 U.S.C. §423(a), (c). The relevant time period for disability in this case is therefore between April 1, 2002, and December 31, 2002.

Douglas R. Due held on April 14, 2004 (R. 265). Plaintiff, who was represented by counsel, appeared and testified. The ALJ rendered a decision on June 21, 2004, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through his Date Last Insured, December 31, 2002 (R. 19). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5).

## II. Statement of Facts

Plaintiff was born on April 13, 1954, and was 48 years old on the date his insured status expired (R. 49). He has a high school education plus two years of college toward a degree in Business Administration (R. 271). He has past relevant work as a caregiver/nursing assistant in homes and in a nursing home (R. 65). He quit working in March, 2002 (R. 89). He was incarcerated some time in April 2002, and released in August 2002. His past work history is very irregular due, in part, to the fact that he spent a total of approximately 21 years in jail since 1980 (R. 270). He was in the Navy from 1974-1978, with two years of active duty on the USS Trenton and in Spain and Brooklyn, NY (R. 183). He was trained as an electrician (R. 70). He saw action in about 1975 "when Turkey and Greece were engaged in a conflict. His ship was used to evacuate the prince of Egypt, who was vacationing nearby." His highest rank attained was E-3, but he was "busted down one rank" for bringing beer aboard ship. He was honorably discharged in 1978.

The record in this case indicates Plaintiff obtained all his treatment and evaluations through the Veterans Administration ("VA").

On January 7, 2002, Plaintiff presented to the VA for a routine check up (R. 217). He complained of toenail fungus. He said he was scheduled for knee and left foot surgery. He requested a dental consult and also requested Viagara. The evaluator found Plaintiff had no nutritional needs

2

or concerns and had no functional concerns, including walking. Plaintiff said he exercised on a regular basis and was encouraged to exercise at least 30 minutes three times per week. A screening for depression was negative. Plaintiff said he had experienced being attacked, being in combat, being threatened with a weapon, and seeing someone badly hurt or killed. His trauma screening, however, was also negative. The evaluator referred him to VA physician Alan Hamilton, M.D. for evaluation of his physical complaints.

Dr. Hamilton noted Plaintiff was 47 years old, a former homeless person and polydrug abuser, who had been living in the area since his discharge from the VA domiciliary program in December 2000 (R. 219). Plaintiff denied any drug or alcohol use, except for cigarettes. His main complaint was knee pain, more on the right. He said he was due for knee and foot surgery. Upon examination, Plaintiff was ambulatory and in no acute distress. There was evidence of tinea pedis. Both knees were deformed, but with no joint effusion, swelling, or tenderness. Dr. Hamilton assessed degenerative arthritis of both knees, history of personality disorder, polydrug abuse, and nicotine dependence. Plaintiff reported that his medications caused no side effects (R. 216).

Plaintiff worked until sometime in March, 2002.

Plaintiff was incarcerated from sometime in April 2002 until August 25, 2002 (R. 184). He attended the Incarcerated Veterans Group at the Eastern Regional Jail (R. 213). He had also been in jail in 2001, but stated that at the time "he did not know why he was in a s[ubstance] a[buse] p[rogram] . . . ."

Plaintiff was released from the jail on August 25, 2002.

On October 3, 2002, Plaintiff presented to the VA for rehabilitation "to assist with coming off cocaine" (R. 212). He stated he used cocaine daily, including the night before. He also used

alcohol, including the night before. Plaintiff was diagnosed with substance abuse and referred to the Domiciliary substance abuse clinic (R. 212). Upon examination, Plaintiff was 6'1" tall and weighed 192.5 pounds.

On October 8, 2002, Plaintiff was accepted into the VA Domiciliary program for substance abuse treatment, to report on October 15 (R. 210). It was noted he was homeless yet employed. His diagnosis was substance abuse and his only treatment need was listed as Substance Abuse.

On October 14, 2002, Plaintiff presented to the VA emergency room for productive cough and fever off and on for a few days (R. 209). He had been living in a rescue mission and requested lodging for the night. It was noted he was to enter the Domiciliary program the next day. He was alert and fully oriented. He was diagnosed with sinusitis and an upper respiratory infection (R. 209).

On October 15, 2002, Plaintiff underwent an evaluation at the VA Medical Center ("VAMC") for his entry into the Domiciliary program (R. 203). The examining physician noted Plaintiff's only "present illness" as "a long history of cocaine dependence." He had attended the VA's outreach substance abuse program at the Eastern Regional Jail, but could not maintain his abstinence once out of jail in August. He came to the VA "when his work ended and he became homeless." He said he "just stopped" using cocaine on October 9, 2002. His only psychiatric diagnosis was "rule out personality disorder (R. 205).

Upon physical examination, Plaintiff's back had normal curvature and mobility and he had no pain or tenderness. He had crepitance of the knees, with no effusion, with pain only at the extreme range of motion (R. 206). His left big toe was tender and swollen. Another examiner that same date noted Plaintiff had normal range of motion, moved all extremities well, had no limitations, and ambulated independently (R. 193). Plaintiff rated his pain as a five on a scale of one to ten at

4

its worst as well as on average (R. 195). The quality of the pain was "dull" and interfered with his "enjoyment of life."

Plaintiff reported activities including reading, television, chess, and playing basketball (R. 197). He reported the things that kept him calm and in control were reading and basketball.

Plaintiff's diagnosis was Polydrug dependence – cocaine, Alcohol dependence, Depression NOS (Axis 1), Personality disorder, NOS (Axis 2), Gout, Post traumatic osteoarthritis of the knees, shoulder, and elbow, a bunion, and tinea pedis (Axis III). His GAF was assessed as 47.[3]

A neurological assessment showed Plaintiff was alert and fully oriented, with memory intact (R. 193). Physical examination showed normal range of motion in all extremities, with no limitations. He ambulated independently. Plaintiff weighed 198 pounds (R. 223). Plaintiff reported no side effects from his medications (R. 207).

On October 16, 2002, Plaintiff's substance abuse treatment staff created a master treatment plan (R. 190). Plaintiff stated his goal was to return to work and obtain housing in the area. He was found to be employable. His "primary problem" was "Substance Abuse/Dependence: Inability to stop or cut down use of the mood-altering drug once started, despite the verbalized desire to do so and the negative consequences that continued use brings."

On October 17, 2002, Plaintiff had a recreational therapy assessment (R. 188), during which he told the therapist he currently participated in softball, basketball, chess, ping pong, church, walking, weights, biking, traveling, dinners, television, movies, pool, bowling, reading, and music.

---

[3]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

He said his energy level was moderate and he stated he had torn cartilage in his right knee. The therapist found Plaintiff was polite, made good eye contact, had no apparent short term or long term memory problems, had good patience, and a high level of tolerance for frustration. He demonstrated good social interaction skills and could deal with both vets and outside civilians. He felt less social in his addiction, however. He loved recreation and could see how it would play a part in his recovery. He had kept his recreation participation apart from his drugging.

On October 21, 2002, Plaintiff presented to the doctor for complaints of itching feet (R. 188). He was diagnosed with chronic fungal infection of the toenails. He also requested an HIV test.

On October 21, 2002, Plaintiff told his social worker at the VA that he enjoyed sewing, movies, chess, and taking walks, and playing ping pong, tennis, and basketball (R. 186). He reported his mood as 10 out of 10, 10 being best (R. 185). There were no cognitive deficits noted.

Plaintiff reported he had used pot, hashish, and amphetamines recreationally while in the Navy. He was honorably discharged, but had been "busted down" a rank for bringing beer aboard ship (R. 183). He admitted his only periods of non-use of cocaine and crack were when he was in treatment (R. 181). His cocaine use averaged about $150.00 per day. The addiction led to his divorce, job problems, strained relationships with his family, and arrest. He also believed it led to depression. The social worker prioritized Plaintiff's problems as cocaine dependence, alcohol dependence, and depression, NOS (R. 186).

On October 23, 2005, Plaintiff presented to the VA doctor with complaints of a skin rash after shaving his head (R. 180). He also requested smoking cessation classes. He was diagnosed with skin rash and nicotine dependence, and was instructed on shaving technique and given Basis soap and Lubriderm moisturizer.

6

On October 28, 2005, Plaintiff presented to the doctor complaining of sore throat and cough (R. 179). He was diagnosed with an upper respiratory tract infection.

At an October 28, 2002, Psychological Assessment, it was noted that Plaintiff had "recently lost his job due to his addiction" (R. 178). The psychiatrist reviewed Plaintiff's history for use in identifying additional problems and goals for Plaintiff's first treatment plan review (R. 178). He noted Plaintiff was being treated for DJD of the knees and gout. His diagnosis was cocaine dependence and alcohol dependence (Axis I),[4] personality disorder, NOS (Axis II), gout, post-traumatic osteoarthritis, bunion and tinea pedis (Axis III), homeless, unemployed, and legal problems (Axis IV) and a GAF of 47. There were no medications for mental impairments listed or added.

On October 31, 2002, it was noted Plaintiff was compliant with all treatment, directions, and rules (R. 177). He interacted well with his peers.

At a "Nutrition Assessment" dated November 1, 2002, plaintiff reported he had no eating problems and his appetite was "good" (R, 176). His Nutrition Status was determined to be "normal." He had gained 15 pounds in the past two months. He was at about his desirable weight.

Plaintiff had a neurocognitive screening on November 1, 2002 (R. 173). He was motivated and attentive. He switched numbers around several times. His estimated IQ was below average. His memory was average, motor and perceptual speed was average, and his cognitive flexibility was significantly below average. The staff psychologist found the poor performance on the cognitive flexibility test was due to his reversal of numbers and noted the overall testing did not warrant a full neuropsychological work-up.

At a substance abuse treatment plan review conducted on November 4, 2002, it was found

---

[4]There was no diagnosis of depression pursuant to the psychologist's examination.

that Plaintiff's primary problem was still substance abuse/dependence (R. 171). His secondary problem was relapse proneness due to history of multiple treatment attempts and relapse. Two other secondary problems listed were chronic pain syndrome and "dependent traits – chronically fearful of interpersonal abandonment and desperately clings to destructive relationships."

On November 5, 2002, Plaintiff complained of increasing pain in his right knee and pain in his left knee. He said the ibuprofen was affecting his stomach. The assessment was DJD of both knees. He was to discontinue ibuprofen and start Salsalate.

On November 5, 2002, Plaintiff's therapist noted Plaintiff was in a good mood most of the time he saw him (R. 170).

On November 6, 2002, Plaintiff requested and received a flu vaccine (R. 168).

Lumbar spine x-rays performed November 18, 2002, showed only moderate degenerative arthritis of L5-S1 (R. 221).

On November 19, 2002, Plaintiff told a physicians assistant he was getting very little relief from the Salsalate, and wanted a cane or walker (R. 165). The physicians assistant assessed arthritic pain of the right knee, and referred him for measurement, education, and dispensing of a wooden cane. He received a cane the next day (R. 164).

Plaintiff underwent a Psychiatry Consult at the VAMC on November 21, 2002, "to rule out personality disorder" (R. 157). He was examined by psychiatrist Paul S. Mueller, M.D. Plaintiff denied any depression, anhedonia, suicidal or homicidal ideation, or violent ideation. He said he became homeless because he was using drugs. He denied manic symptomology. He did describe a history of bad relationships, unstable relationships, and a fear of abandonment. He stated he "love[d] himself." He endorsed reckless sex, illegal activities, mood swings, sometimes poor sleep,

8

and irritability. He denied any dysphoria, feelings of emptiness, anger, or violence. He said he was sometimes paranoid –explaining, for instance that when he saw someone wearing a confederate flag he felt "a little bit uneasy around this person" (Plaintiff is African American). The psychiatrist found this did not seem to be out of proportion to real-life events. Plaintiff's only social symptoms were "difficulty obeying the law." He reported being manipulative and impulsive. He had reckless disregard for other people's safety and "the inability to hold a job." He had no history of psychiatric treatment.

Upon mental status examination, Plaintiff was cooperative, pleasant, his mood was pleasant, he was alert and fully oriented, his mood was appropriate, his speech normal, his memory intact, his concentration intact, and his insight and judgment fair. The psychiatrist's diagnosis was (Axis I) Cocaine Dependence; (Axis II ) rule out antisocial traits, possible cluster B;[5] (Axis III) back problems and gout; and (Axis IV) homeless.[6] His GAF was rated at approximately 55.[7]

The psychiatrist noted:

> The patient does endorse the symptomatology consistent with some antisocial personality, however, this may be in conjunction with substance abuse. It is difficult to say. He is equivocal in a lot of things.

---

[5]The essential feature of Cluster B antisocial personality disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 645 (4th ed. 1994).

[6]There is no diagnosis of depression or PTSD.

[7]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

(R. 159).

On November 26, 2002, Plaintiff requested a physical examination to determine what work, if any, he could do (R. 151). The PA advised he could not be cleared for work until seen by an orthopedist and referred him for an orthopedic examination.

On December 3, 2002, Plaintiff presented to orthopedist Rudolf Lemperg, M.D., for an examination regarding his complaint of "intermittent pain in both knees" (R. 231). Plaintiff told the doctor he had had an MRI done two years earlier that showed only "some mild minor degenerative changes." He had not brought the report with him, however. Dr. Lemperg reported Plaintiff told him he was "absolutely okay in his knees and he has no pain and he does not want to have anything done." He was taking two 400 mg. tablets of Motrin, and wanted to know if that was a "big dose." The specialist stated:

> I tell him that this is a small dose and there our conversation ends.
> He does not want to have anything done today and he should come
> back if and when he needs to have orthopedic attention.
> I have not examined his knees.

(R. 231).

On December 5, 2002, Plaintiff presented to the PA as a follow up to his orthopedic examination (R. 149). The PA noted that because there was no orthopedic recommendation either for or against his working, he could not clear him for work. He also noted Plaintiff was "still not taking NSAIDS as directed."

On December 11, 2002, Plaintiff reported he no longer was looking into the homeless program, because his "situation had changed," in that he "has been approved for an NSC ("non-service-connected") pension" (R. 156).

10

The discharge notes from the Domiciliary Substance Abuse treatment program counselor on December 13, 2002, noted the same primary problem of substance abuse/dependence, and secondary problems of chronic pain syndrome and dependent traits (R. 146). It was noted that Plaintiff had asked to go into the homeless program, but after being interviewed twice was denied both times "for lack of what the team considered the patients agenda, and not wanting to become employed" (R. 146-147). Plaintiff stated he wished to go into a structured environment even after he started getting his checks. He was approved to go to the Wells House.

On December 18, 2002, Plaintiff was discharged from the VA Domiciliary Substance Abuse program (R. 145). He was going to the Wells House and planning to seek employment. His Discharge diagnosis, as reported by the PA, was Axis I: Cocaine Dependence, Alcohol Dependence, Depression; Axis II: Personality Disorder, NOS; Axis III: gout, post traumatic osteoarthritis, and tinea pedis; and Axis IV: homeless, unemployed. His GAF was assessed as 65 [8] (R. 146). He was never prescribed or recommended any medications for mental problems. He was using only Capsaicin lotion, Lubriderm moisturizer, Clotrimazole solution and miconazole powder (antifungals), and Salsalate.

Plaintiff's reported pain locations were lower back, knees, and bunion on the left foot. The pain type was noted as chronic. His only physical restrictions were no heavy lifting– nothing over 10 pounds, no prolonged walking and no prolonged standing (R. 145).

Plaintiff's Insured status expired December 31, 2002.

---

[8] GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

Plaintiff had a podiatry consult in February 2003 (R. 199). It was noted he had pain with pressure on the medial side of the left foot, but no apparent acute redness or swelling. An x-ray of the left foot on February 12, 2003, showed only "mild hallux vagus deformity"[9] (R. 221). It was diagnosed as a "minor abnormality."

At a psychiatry outpatient visit with Dr. Mueller in February 2003, Plaintiff reported drinking occasional alcohol, but was "very vague as to amount" (R. 143). He denied drugs. His affect appeared dysthymic and he described his mood as "tired." He said he drank because he was "bored." He denied suicidal or homicidal ideation. He was alert and fully oriented. There were no hallucinations or delusions. Plaintiff identified stressors in the service, including "death of friend when a merchant ship struck a boat that he was riding in, killing his best friend and also his chief in 1977." He also identified post-service trauma, including incarceration and the death of his parents (his father died in 1988 at age 75, and his mother died in 1994 at age 73) (R. 129). He was not going to AA on a regular basis, but was seeing his counselor. He said he had nightmares and depression-"the only symptoms of PTSD he identifies." Dr. Mueller diagnosed mood disorder NOS and alcohol dependence (R. 143).[10] He prescribed no medications.

On April 9, 2003, Plaintiff requested refills of his multivitamins and Tylenol and a consult for eyeglasses. He had not been seen by a doctor recently, so an appointment was arranged.

On April 11, 2003, Plaintiff saw his treating physician, Dr. Hamilton. He told Dr. Hamilton he had "no complaints, except for an increase in heartburn due to Motrin" (R. 138). He had been

---

[9]Angulation of the big toe away from the midline of the body or toward the other toes. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 811 (30th ed. 2003).

[10]There is no diagnosis of PTSD, depression or personality disorder.

using only Motrin for pain. Upon physical examination he was ambulatory in no distress. He had

no edema. He was diagnosed with degenerative osteoarthritis, gout, PED, personality disorder,

chronic dyspepsia, and polydrug dependence, recovering (R. 140). His medications were ibuprofen

400 mg. one tablet four times per day (for pain); multivitamin; rabeprazole (for GERD); and

sildenafil citrate (for erectile dysfunction).

On April 18, 2003, Plaintiff underwent a "medical clearance" examination for work training

and recreation (R. 135). His capacity for work therapy and incentive therapy was listed as "moderate

physical impairment, can do up to four hours of moderately strenuous work or up to eight hours of

sedentary work."[11] His mental ability was average and his psycho-social adjustment was excellent.

He needed to avoid ladders, other climbing activities, and should not lift above 20 pounds. Plaintiff

was also cleared for swimming bowling, bicycling, wood shop, and fitness with the only limitation

being no resistance exercise involving his legs and no running.

Plaintiff asked for an orthopedic consult "as he has a little pain in knee at times." His pain

rating scale was 0. His pain score was 0 (R. 137-138).

On April 25, 2003, Plaintiff was cleared for the work therapy and incentive therapy programs.

He reported currently receiving over $800.00 per month from non-service connected pension (R.

134). He did not want to return to community employment, but said he wanted to see what he could

do and "perhaps someday return to gainful community employment." Plaintiffs's limitations were

listed as no twisting activities, no climbing, and no lifting above 20 pounds (R. 133).

---

[11]The doctor did not assess Plaintiff with the more limiting: "More severe physical
impairment, cannot do strenuous work, can usually do more than 6 hours of sedentary work with
excessive fatigue," or "Acute Physical impairment(s), with perhaps some non-physical
problems(s). Can do up to 4 hours of light work at own pace or no more than 2 hours at 'normal
productive' work pace."

On May 21, 2003, Plaintiff reported to his social worker that he was seeking admission to the health maintenance program because he had left public housing because he was living next to drug dealers and the manager refused to move him (R. 126). He stated he was unable to work due to foot and arthritis problems, but the social worker noted he had been medically cleared for sedentary work. She also noted he nevertheless had not applied for any work in over a year, because he was "seeking a position commensurate with his educational background."

Plaintiff was rejected for the health maintenance program because he "ha[d] no treatment need" (R. 228). Plaintiff agreed with the decision, stating he "was only checking out possibility for future reference."

On May 23, 2003, Plaintiff applied for clearance for bunion surgery (R. 125). He reported "minimal pain [left] foot at about level 3 on scale of 1-10" (R. 125). Dr. Hamilton noted Plaintiff was "ambulatory in no distress." He found Plaintiff had a "history of" gout, as well as tinea pedis and degenerative osteoarthritis which were "stable" (R. 123). He cleared Plaintiff for bunion surgery scheduled for May 28, 2003. He noted Plaintiff's medications were still unchanged.

On May 28, 2003, Plaintiff presented to the podiatrist for a follow-up (R. 121). He complained of bunion pain in his left foot since he left the service 29 years earlier. Exercise shoes and Motrin helped the pain, which he rated a 10 when it was bad- stating it was bad all the time. He reported the left big toe turned really red and swelled. The doctor diagnosed a symptomatic hallux abducto valgus and ordered x-rays.

The x-rays showed the bony structures and joint spaces were normal, and the soft tissue was within normal limits. The impression was "normal left foot."

On May 30, 2003, Plaintiff's vocational rehabilitation counselor noted Plaintiff was assigned

to participate in work therapy in the Laundry as a "Light Duty Textile Worker, 40 hours per week to begin on 06/02/03 to 07/26/03 for work assessment, stabilization and community re-integration" (R. 120). Plaintiff indicated his job goals as medical billing, patient care, and residential aide for the mentally impaired.

Plaintiff applied for DIB on June 5, 2003. He stated he had stopped working in March 2002, because of steady pain through his body and mental condition (R. 64).

On Plaintiff's Activities of Daily Living Questionnaire, he stated he currently lived in a homeless shelter, and no one depended on him for care[12] (R. 96). He reported trouble sleeping due to pain, and took naps during the day due to pain and medication. He stated he needed no help taking care of his personal needs and grooming, and prepared his own breakfast (eggs and bacon), lunch (soup and sandwich), and dinner ("whatever"). He did not, however, always have an appetite, due to his medications.

Plaintiff said he did laundry and paid bills and managed his own bank accounts. Friends helped him with other housework or chores "when[] they [we]re not busy" (R. 97). He needed the help due to the pain becoming unbearable and the medication making him dizzy and drowsy. He did shop for food, clothing, medication, cigarettes and newspapers (R. 98). He walked or took public transportation or a taxi. His activities and interests included reading, watching television, and listening to the radio and other music. He had no hobbies or interests. He visited relatives "every now and then." He reported no problems getting along with other people. He reported problems concentrating. He "prefer[red] not to take on something to cause [him] to forget or concentrate." He had no problem following directions, and stated his ability to concentrate, complete tasks and

[12]Although the form is undated, it necessarily was completed in or after June 2003.

15

follow instructions had not changed much since his condition began – "only now and then."

On Plaintiff's Personal Pain Questionnaire, he described pain in his back, both knees, left foot, and throughout his body due to PTSD, migraines, gout, PED, and degenerative osteoarthritis causing depression. The pain was continuous. He could not bend over to pick up a certain amount of weight for a long period of time, due to back pain (R. 101). The pain was worsened by "lifting, walking sometimes, sitting, bending over for a long period of time." The pain was relieved by "the medication that I take everyday, hot soakes [sic] or whirlpool." His medications for pain were two 400 mg. Ibuprofen tablets every four hours, which relieved the pain "always" (R. 102), Capsaicin lotion[13] which relieved the pain "always," and multivitamin therapy which relieved the pain "always." He alleged these medications caused stomach upset, loss of appetite, mental and mood changes, decreased interest in sex, fatigue, and constipation (R. 102).

On June 16, 2003, almost six months after his insured status expired, Plaintiff told his VA psychiatrist he had combat in the 1970's, when he helped evacuate the prince of Egypt from the country, and felt he had depression from this. He said he had been "at watch from the switchboard and was 'unable to interpret the matters at hand.'" The Psychiatrist found his "description was non-specific with regard to trauma." Plaintiff said he was depressed. He still went bowling, read, talked to family, and worked at the CWT. His mood was pleasant and his affect appropriate. He was alert and fully oriented. He said he slept 4-5 hours per night and his appetite was good, but he wanted to start an antidepressant. His main complaints were irritability and "I don't like myself at times" (R. 118). He had dropped out of his substance abuse counseling, but said he was going back. He was

[13]An alkaloid irritating to the skin and mucous membranes, used as a topical counterirritant and analgesic. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 285 (30th ed. 2003).

diagnosed with mood disorder NOS and alcohol dependence.[14]  He was prescribed Zoloft.  The psychiatrist informed him it might cause sexual dysfunction, gastrointestinal upset, and sedation.

On June 20, 2003, Plaintiff presented for a podiatry follow-up (R. 116).  He was diagnosed with symptomatic hallux abducto valgus of the left foot.  He said he desired surgery.

On June 24, 2003, Plaintiff was a "no show" for his vocational counseling, psychiatry scheduled progress review (R. 116).

On July 2, 2003, Plaintiff presented for a pre-op history and physical for his bunion surgery (R. 113).  He said the pain had gotten worse over time.  He was living at a mission, and surgery was therefore postponed until Plaintiff had a home to go to for recovery, which would last about three weeks.  In the meantime he was provided with arch supports.

On July 23, 2003, State agency reviewing physician Thomas Lauderman, D.O. completed a Residual Functional Capacity Assessment ("RFC"), opining Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day (R. 250).  He had no other limitations.  Dr. Lauderman noted Plaintiff took only Motrin for pain and had "some minor" decrease in range of motion.  He opined Plaintiff could work at the medium level.  Dr. Lauderman expressly noted the evaluations by the physicians assistant limiting Plaintiff to no lifting over ten pounds and no prolonged standing or walking, but disagreed with the PA's assessment, opining the medical evidence of record showed Plaintiff could perform medium work (R. 255).  He specifically noted the December 2002, physical examination during which it was found Plaintiff's back was normal with no pain or tenderness; his left big toe was swollen; there was bilateral crepitus in the knees and pain at the extremes of range of motion,

_____

[14]Again there is no diagnosis of PTSD.

but no effusion. He also noted the lumbar x-ray showing only moderate degenerative arthritis of L5-S1. He particularly noted the orthopedic specialist consult during which Plaintiff said he had absolutely no complaints and was only taking 400 mg. Motrin in December 2002. Finally, he noted Plaintiff had been prescribed a cane, but it was at his own request and there was no medical documentation for it.

A State agency reviewing psychological consultant completed a Psychiatric Review Technique ("PRT"), opining Plaintiff had an affective disorder and personality disorder, but neither were severe (R. 235). He also opined Plaintiff's degree of limitation, if any, due to these impairments were mild (R. 245).

At the Administrative Hearing in April 2004, Plaintiff testified he had spent approximately 21 years in jail since 1980 (R. 273). His last job was as a caregiver at a nursing home (R. 272).

Plaintiff testified he had been taking Resperdone for the past three months because he was hearing voices (R. 274). He testified this was diagnosed in about November 2003, but he had actually been hearing voices since he left the Navy in 1978. He said he had difficulty eating and sleeping, feelings of guilt or worthlessness, difficulty concentrating, and suicidal thoughts. He was taking Colchicine for gout for the past "couple of days" (R. 275). He had taken something else before that, but could not remember what. He took ibuprofen for pain for three or four years, and Zoloft for about a year. He said he took Paxil before that.

Plaintiff testified he was using a cane at the hearing because of "the gout in my ankles and [] two torn ligaments." The doctors were talking about surgery for the torn ligaments. When asked how the gout affected him, he testified he could not walk a long period of time. He also stated the arthritis prevented him from bending down to even tie his shoes without pain (R. 281).

Plaintiff testified he heard the voices every day. When asked how long he had been hearing voices, Plaintiff testified:

> Ever since – I never – I've just been avoiding the hospital. It's just recently I just realized how bad I'd become, you know, not getting any help. Because talking to the doctors over the years I – they, you know, they see a bizarre life that I have led because of the incarceration and things like – of the sort that never sought medical attention until recently.

(R. 281)[sic]. When asked again how long he'd been hearing the voices, he testified: "Ever since I left the military." He then testified:

> I was aboard ship when 49 people died and I never got over that so I used drugs to ward off the voices.

He testified the people killed, including two close friends, were on a small ship that was run over by a larger merchant ship. He saw their ship come in and the merchant ship run over them. He saw them die and couldn't do anything about it. He had "a lot of flashbacks" "every day" "constantly" ever since he left the military (R. 283). The reason he could not be in a relationship was because the flashbacks would cause him to "get up yelling in the middle of the night." His family did not trust him because of th flashabacks. They did not want him to visit them "because they don't know if my reactions at time" [sic].

Plaintiff testified his only activity was reading. He said he did not interact with people well. He also testified he had trouble concentrating and did not communicate well.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability

19

and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2002.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

6. The claimant has the following residual functional capacity: the claimant can perform no more than sedentary level work.

7. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8. The claimant is a younger individual (20 CFR § 404.1563).

9. The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work (20 C.F.R. § 404.1568).

11. The claimant has the residual functional capacity to perform substantially all of the full range of sedentary work (20 CFR § 404.1567).

12. Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, Medical-Vocational Rule 201.21, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

13. The claimant's capacity for sedentary work is substantially intact and has not been compromised by any nonexertional limitations. Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time relevant to this decision (20 CFR 404.1520(f)).

(R. 19).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The Administrative Law Judge did not consider all the evidence;

2. The ALJ did not develop the record; and

3. The ALJ erred by relying on the Medical Vocational Guidelines to find Plaintiff was not disabled, because Plaintiff's non-exertional impairment (pain) required the ALJ to consult a vocational expert ("VE").

Defendant contends:

1. The ALJ considered the information which the VAMC provided in support of Plaintiff's claim;

2. The ALJ considered Plaintiff's alleged non-exertional physical impairments, but found his symptoms and complaints not credible;

3. The ALJ considered Plaintiff's personality disorder, but found it did not cause any significant limitations.

## C. Credibility

The undersigned finds this case rises or falls on whether Plaintiff's allegations about his pain and limitations are credible, and therefore addresses this issue first. The ALJ found Plaintiff was not entirely credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

Under the regulations, the ALJ's evaluation of pain must take into account not only the claimant's statements about his pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . . ; any objective medical evidence of pain

(such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). See 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. See 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3).

The undersigned finds the ALJ properly considered the evidence in determining that Plaintiff was not credible. As the ALJ noted, there was a lack of medical signs, laboratory findings, and objective medical evidence of pain supporting the level of pain Plaintiff alleged. Lumbar spine x-rays indicated only moderate degenerative arthritis at L5-S1, and back examination showed normal curvature and mobility, with no pain or tenderness. Pain was elicited only at the extreme range of motion of the knees. Although Plaintiff's left first metacarpal was tender and swollen, x-rays showed either a normal left foot or, at worst, only a mild abnormality.

According to Plaintiff's orthopedist, Plaintiff was taking only a "small dose" of Motrin and Capsaicin Lotion for his pain. Plaintiff stated in his Pain Questionnaire that these medications "always" relieved his pain. He also told his doctors his medications caused no side effects, aside from some heartburn. Additionally, Plaintiff's own reports of his activities during the relevant time are inconsistent with his complaints of pain. He reported playing softball, basketball, ping pong, bowling, and chess, and walking, biking, exercising, and lifting weights.

Social Security Ruling ("SSR") 96-7p also provides:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:
>> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

Plaintiff's statements regarding his impairments and limitations are totally inconsistent throughout the record. For example:

- In January 2002, Plaintiff denied any drug or alcohol use. Subsequently he reported the only time he was <u>not</u> abusing drugs was when he was in treatment.

- Plaintiff told his physicians his drug abuse led to his divorce, job problems, and strained relationship with his family. At the hearing, however, he testified his family did not trust him and did not want him to visit them because of his "flashbacks," and the reason he could

24

not maintain a relationship was his flashbacks caused him to "get up yelling in the middle of the night." There was absolutely no mention of flashbacks during the relevant time period.

- Plaintiff told his physicians he had a good appetite. Yet in his Application he stated that his medications (Ibuprofen, Capsaicin, and multivitamins) caused him to lose his appetite (R. 97).

- Plaintiff told his psychiatrist he did not have depression, anhedonia, or dysphoria. Yet in his Application he alleges depression as his first impairment (R. 64).

- Plaintiff also alleges he had PTSD in his Application, while there is no support for this impairment in the record at the relevant time, or even at the time he completed the Application.

- Plaintiff told Dr. Hamilton in April 2003, he had no complaints, except for an increase in heartburn due to Motrin. Yet in his Application only two months later, he alleged his Ibuprofen, Capsaicin and multivitamins caused stomach upset, loss of appetite, mental and mood changes, decreased interest in sex, fatigue, and constipation (R. 102).

- Plaintiff told Dr. Hamilton he had minimal pain in his left foot at about a level three on a scale of ten. Five days later, Plaintiff told the podiatrist his foot pain was a 10 all the time.

- Plaintiff told his physicians and psychologists he lost his job due to drug abuse. In his Application, however, he stated he stopped working because of steady pain throughout his body and his mental condition.

- On his Application in June 2003, Plaintiff stated Dr. Mueller was treating him for depression

(PTSD), whereas Dr. Mueller neither diagnosed nor treated him for depression or PTSD at the time in question.

- On his Application Plaintiff states he saw Dr. Lemperg in December 2002, for increasing pain in the right knee and possible surgery on torn ACC (R. 66). Although Plaintiff did see Dr. Lemperg in December 2002, he told the orthopedic specialist that he was "absolutely okay in his knees and he ha[d] no pain and [did] not want to have anything done." Dr. Lemperg therefore did not even examine Plaintiff's knees, and certainly did not discuss surgery.

- When Plaintiff presented to the VA in October 2002, his only expressed reason for requesting admission into the Domiciliary Program "to assist with coming off cocaine." Yet Plaintiff stated on his Application for Social Security benefits that he had been in the VAMC from October to December 2002, due to: "Medical problems – psychological counseling to deal w/ pain & not over medicate myself" (R. 67).

- Plaintiff also testified he lost his job as a caregiver due to gout, PTSD, and depression, whereas the record clearly indicates he lost his job due to "drugging."

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's complaints regarding his pain and limitations were not fully credible.

### D. Veterans Administration Pension

Plaintiff argues the ALJ did not discuss the fact that the VA had found that he was permanently and totally disabled. There is no evidence in the record, however, that Plaintiff was ever determined to be permanently and totally disabled, except for several mentions that Plaintiff

reported receiving an "NSC pension" in December, 2002. Pursuant to 30 U.S.C. § 1521(a), the VA is required to pay non-service-connected disability pension to a veteran of a period of war "who is permanently and totally disabled from non-service connected disability not the result of the veteran's willful misconduct." There is no documentation regarding this pension or the basis for it, however. The award itself is not even included in the record. Plaintiff's counsel informed the ALJ at the Administrative Hearing that Plaintiff was "getting a non-service connected pension because he was in during the Vietnam era but he never went to Vietnam" (R. 283). Plaintiff is correct that the ALJ did not discuss this "pension" in his decision. The undersigned even believes it reasonable that the ALJ did not know the "pension" required disability.

20 CFR § 404.1504 provides:

A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

Plaintiff incorrectly asserts that the Fourth Circuit holds that an ALJ must give great weight to a VA determination of disability, however. Plaintiff cites McCartey v. Massanari, 298 F.3d 1072 (9ᵗʰ Cir. 2002), which does state that the Fourth Circuit found the VA rating is entitled to great weight. Unfortunately, the Ninth Circuit incorrectly cited DeLoatche v. Heckler, 715 F.2d 148, 150 n.1, which actually states:

Neither the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary. Nevertheless, we have repeatedly stressed that "the opinion of a claimant's treating physician is entitled to great weight." Similarly, the disability determination of a state agency is entitled to consideration by the Secretary.

Further, even if the award of the NSC pension was entitled to "consideration" by the ALJ, the undersigned finds this omission at most harmless non-reversible error on the facts of this particular case. All the medical evidence in the record is from the VA. The ALJ discussed this evidence. This evidence clearly shows Plaintiff was not disabled. In fact, his treating physician at the VA, Dr. Hamilton, expressly found that Plaintiff could work at the sedentary level and cleared him for work training and recreation (R. 135). He was also cleared for swimming, bowling, bicycling, wood shop, and fitness. When Plaintiff told his social worker at the VA he was unable to work due to foot and arthritis problems, she clearly noted Plaintiff had been medically cleared for sedentary work, but had not applied for a year because he was "seeking a position commensurate with his educational background" (R. 126). Subsequently, Plaintiff was actually assigned light-level work in the laundry.

In addition, in January 2002, an examiner found Plaintiff had no functional concerns, including walking. Plaintiff said he exercised on a regular basis. Upon physical examination in October 2002, Plaintiff's back had normal curvature and mobility with no pain or tenderness, and he had pain in his knees only at the extreme range of motion. He had normal range of motion, moved all extremities well, had no limitations, and ambulated independently. His left big toe was tender and swollen and Plaintiff did rate his foot pain as a five, but Plaintiff reported playing basketball, softball, ping pong, and chess, lifting weights, biking, traveling, bowling, playing pool, reading, and walking. He loved recreation and had kept it apart from his drugging.

Significantly, when referred to an orthopedic specialist for his complaint of what was described as only "intermittent pain in both knees," Plaintiff informed the doctor he was "absolutely okay in his knees," had "no pain," and did not want to have anything done. He was taking what the specialist referred to as only a "small dose" of Motrin.

All the medical evidence is inconsistent with a finding that Plaintiff was totally and permanently disabled, or even temporarily and partially disabled. Plaintiff's treating physicians expressly found he could work. The undersigned therefore finds the ALJ's omission of the NSC pension from his discussion of the evidence is, at most, harmless, non-reversible error.

## E. Non-Exertional Limitations

Plaintiff next argues the ALJ did not discuss evidence showing he suffered from non-exertional limitations such as chronic pain, fatigue, and symptoms of a personality disorder. Plaintiff first cites to his own testimony and statements regarding his symptoms. As already discussed, however, substantial evidence supports the ALJ's determination that Plaintiff's allegations regarding his pain and limitations were not credible. Further, the Administrative Hearing, at which Plaintiff testified, was held approximately one and a half years after his insured status expired. While Plaintiff's symptoms in August 2004, may well have been as he testified, there is no evidence whatsoever of some of those subjective symptoms as of December 2002. For example, Plaintiff testified at the hearing that he was hearing voices and was prescribed medication for that. There is absolutely no evidence or even a mention of this symptom in the record at the relevant time. He expressly denied any hallucinations or delusions. Plaintiff even admitted at the hearing that he had only been evaluated, diagnosed, and treated for the voices in November 2003, nearly a year after his insured status expired. Still, Plaintiff testified he had actually been hearing voices every day, constantly, ever since his military service decades earlier. The undersigned finds it simply not credible that Plaintiff underwent inpatient and outpatient psychiatric and psychological evaluation and treatment for years and never mentioned he heard voices. In fact, Plaintiff was not prescribed any medications for any mental impairment until long after his insured status expired.

The fact that the VA gave Plaintiff a cane when he requested one is also not persuasive evidence of subjective pain. Plaintiff testified he needed the cane because of the gout in his ankles and two torn ligaments. Again, the medical record does not support this claim. Plaintiff did request a cane due to pain from arthritis in the right knee (R. 164, 165). Only two weeks later, however, he told the orthopedic specialist, who saw him for complaint of only "intermittent pain in both knees," that he was absolutely okay in his knees, had no pain, and wanted nothing done (R. 231). The doctor also noted Plaintiff's dose of Motrin was "small." There had been no mention of ankle problems.

Although Plaintiff may have been suffering from fatigue at the time of the hearing, there is again no evidence he suffered from fatigue during the relevant time period. Although he indicated on his Application (in 2003) that his medications caused fatigue, those medications, Ibuprofen, Capsaicin, and multivitamins, are the same as he was taking during the relevant time. At that time, however, the only side effect Plaintiff reported was some heartburn, for which he was prescribed medication.

In addition, Plaintiff's own statements regarding his activities during the relevant time are entirely inconsistent with his complaints of chronic pain and fatigue. He reported playing softball, basketball, chess, ping pong, bowling, lifting weights, walking, bicycling, exercising, preparing full meals, and taking care of all his own personal needs.

Although there are, as Plaintiff states, "medical records indicating that the Plaintiff may suffer from a personality disorder [and] chronic pain syndrome," (emphasis added). Plaintiff's treating psychiatrist, Dr. Mueller, at first diagnosed Plaintiff with cocaine dependence and "rule out"

30

antisocial traits; possible cluster B. Significantly, Plaintiff was first referred to Dr. Mueller for an evaluation to "rule out personality disorder." The psychiatrist noted:

> The patient does endorse the symptomatology consistent with some antisocial personality, however, this may be in conjunction with substance abuse. It is difficult to say. He is equivocal in a lot of things.

(R. 159). A few months later, after Plaintiff had completed his substance abuse inpatient treatment, and after his insured status had expired, Dr. Mueller diagnosed Plaintiff with alcohol dependence and mood disorder, NOS. The undersigned notes Dr. Mueller never diagnosed Plaintiff with PTSD, chronic pain syndrome, depression or personality disorder.

Even if Plaintiff had all these mental impairments at the relevant time, the evidence substantially supports the ALJ's determination that these impairments were not severe at that time. While Plaintiff's GAF was 47 when he first entered the substance abuse treatment program, it was assessed as 65 only about two months later, just before his insured status expired. A GAF of 65 indicates only some mild symptoms, regardless of the mental impairment diagnosed.

Additionally, the State agency reviewing psychological consultant opined Plaintiff's mental impairments were not severe and caused, at most, mild limitations.

Plaintiff's evaluations during the relevant time also showed he made good eye contact, had no apparent memory problems, had good patience, had a high level of tolerance for frustration, and had good social interaction skills. He evidenced no cognitive deficits. He was described as cooperative pleasant, alert and fully oriented, with appropriate mood, intact memory and concentration, and fair insight and judgment. While the psychiatrist did find Plaintiff "endorse[d] symptomatology consistent with some antisocial personality," he also found this may be in

conjunction with substance abuse. He found it difficult to be sure, because Plaintiff was "equivocal in a lot of things."

Finally, Plaintiff's own activities and statements during the relevant time period again are inconsistent with his claims of severe psychological impairment. In addition to his significant list of activities, both mental and physical, after only a few weeks of substance abuse treatment, Plaintiff reported his mood was a ten on a scale of one to ten, ten being best. He expressly denied any depression, anhedonia, suicidal or homicidal ideation, mania, dysphoria, anger, violence, or feelings of emptiness. His only social symptoms was listed as "difficulty obeying the law."

### F. Medical Clearance for Work

Plaintiff next argues the ALJ did not discuss the medical note that said the Plaintiff was not cleared to work. (R. 149). The only stated reasons he was not cleared for work in November 2002, however, is because he had not yet seen an orthopedist. When he did see the orthopedic specialist, Plaintiff told him there was absolutely nothing wrong and he wanted nothing done. The specialist therefore did not examine Plaintiff and did make any recommendation regarding work. The physicians assistant expressly stated he could not clear Plaintiff for work because of the lack of a recommendation. Once Plaintiff underwent the required evaluation, he was immediately cleared for work

### G. Non-Exertional Limitations (the Grids)

Plaintiff also argues the ALJ erred by relying on the Grids because Plaintiff's non-exertional disability (pain) required the testimony of a VE. The ALJ found Plaintiff had no non-exertional impairments. The ALJ also found Plaintiff's subjective complaints of pain were not credible. The

undersigned has already found that substantial evidence supports the ALJ's finding that Plaintiff's allegations regarding his pain were not credible. In fact, Plaintiff told an orthopedic specialist he had absolutely no pain and wanted nothing done. Later, Plaintiff asked for an orthopedic consult "as he ha[d] a little pain in knee at times." (Emphasis added). His pain was rated as "0." Plaintiff's foot was found to be normal or have only a mild abnormality. Plaintiff's own statements regarding his physical and mental activities at the relevant time are inconsistent with his complaints of pain.

Most significantly, Plaintiff's treating physicians at the VA opined he could work at the sedentary level. He actually was assigned Light-level work by the VA. Further, the State agency reviewing physician found that Plaintiff had no non-exertional limitations. The undersigned therefore finds substantial evidence supports the ALJ's determination that Plaintiff's pain did not rise to the level of a non-exertional impairment.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled at any time through his Date Last Insured.

## VI. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment be **GRANTED**, Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed from the court's docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable W. Craig Broadwater, United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of December, 2005.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE